## ESTATE OF C. L. LOW.

### No. 7828—Dec., 1877.

EVIDENCE.—HUSBAND AND WIFE.—Wife cannot be questioned as to conversations between herself and husband upon any subject whatever. Such disability as witness is not removed by the death of husband.

WILL, INOFFICIOUS.—UNDUE INFLUENCE by wife excluding a son from will.

ADVANCEMENT TO HEIR in father's lifetime.

CHARGE TO JURY.

Construing sections, C. C., 1272; C. C. P., 1312, 1313, 1317, 1881.

*Wilson & Wilson,* for proponents.

*McAllister & Bergin,* for contestants.

During the progress of the trial, while the widow of deceased was being examined as a witness on her own behalf,

it was proposed by her counsel to ask her what conversation, if any, she had with her husband (no one else being present) relating to the will, and the reasons given by him for making no other provision for his son, and to show from his statements to her his feelings towards his son as a foundation for the will.

Objected to.

By the COURT: The objection is sustained. Sec. 1881, C. C. P., is very positive in its terms: "There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person cannot be examined as a witness in the following cases: * * nor can either, [husband. or wife] during the marriage or afterwards, be, without the consent of the other, examined as to any communication made by one to the other during the marriage."

The effect of this section is to declare that it is the policy of the law to shut the door upon the family room, and make each secure in the knowledge that their conversation shall not be disclosed without consent. It has been suggested that as one is now dead, that consent cannot be given; very well, the statute has no less force, and the communication is in such case forever sealed. It has also been suggested that the Legislature intended to exclude communications relating to their private relations, their relations as husband ·and wife, and not to exclude business or general communications. The Legislature has not made the distinction. The language is very plain and comprehensive. "*Any communication.*" That embraces all communications. No Court can positively determine what conversation husband and wife at the time intended as referring to their marital relations; therefore the Legislature has positively prohibited *all* communications.

The Judge thereafter charged the jury as follows:

GENTLEMEN OF THE JURY: Although the testimony has occupied many days in being received and heard, and has covered a long space of time, from 1866 to May 9th, 1877, and has been directed to the domestic relations of more than

one household, yet the bearing of all that is pertinent to this case must be directed to one point and to a limited period of time. That point is the condition of the mind of the deceased, C. L. Low, and the period of time is that of the preparation and execution of this will. The question for consideration is, was undue influence exercised over the mind of C. L. Low, at the time of the execution of this will, and was the will the product of that influence?

I propose to give you the rules of law which are to govern you in your deliberations. By those rules you are bound to be governed. You have no right to substitute your own views of the law in place of the rules given you by the Court; nor have you the right to say that in your opinion this view or that view would be more just or equitable. You will find the facts, but you must take the law from the Court. I shall state to you some portions of the testimony; but of those portions, and of all testimony, and of the facts, you are the sole and exclusive judges.

By the law of this State, every man, being of sound and disposing mind, has a right to dispose by will, in such manner as to him may seem fit, of all of his estate remaining after the payment of his debts. That right is perfect and complete, guaranteed by solemn act of the Legislature. No man need, unless he wishes, consult man, woman or child as to how he shall dispose of his property. He may divide it among his family; he may give it all to his wife; he may give it all to his children; he may give it all to any one or more of his children, and cut off any of the others; he may cut off every child, and give it all to strangers. In that regard his own wishes and judgment are sole and supreme, save as to limit in leaving to corporations. The will is to be *his* will not yours nor mine. In order, however, to preserve that right of disposition, it must not be the product of *undue influence.* Whenever a will is the product of undue influence, it is not *his* will, but expresses the wish of some other person. In order, therefore, to know whether a proposed script is the product of undue influence, we must know what undue influence is.

It is that kind of influence or supremacy of one mind over another by which that other is prevented from acting according to his own wish and judgment. A testator should enjoy full liberty and freedom, in making his will, and possess the power to withstand all contradiction and control. "That degree, therefore, of importunity, of influence, which deprives a testator of his free agency; which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act, is sufficient to invalidate it." "It is only that degree of influence which deprives the testator of his free agency, and makes the will more the act of others than of himself, which will avoid it." It is not to be supposed that courts will adopt any such view of the law as will virtually deprive the testator of the right of disinheriting his children even, upon any grounds satisfactory to himself. "Neither advice, nor argument, nor persuasion, would vitiate a will made freely, and from conviction, though such will might not have been made but for such advice and persuasion." The influence which shall deprive one of the testamentary power must go to the extent of destroying free agency. "Undue influence must not be such as arises from the influence of gratitude, affection, or esteem; but it must be the *control* of another will over that of the testator, whose faculties have been so impaired as to submit to that control, so that he has ceased to be a free agent, and has quite succumbed to the power of the controlling will."

Pressure of whatever character, if so exerted as to overpower the volition without convincing the judgment, is a species of constraint under which no valid will can be made.

Undue influence may be defined as that which compels the testator to do that which is against his will, through fear, or the desire of peace or some feeling which he is unable to resist, and but for which the will would not have been made as it was.

The testator may have known what he was about when he made the will, and may have had sufficient capacity to make it; this may all be true, and still, if his mind were not free to act, if it was constrained to act, or if it had become submissive to the will of another who then exercised a com-

manding control over the testator by reason of which freedom of thought and action in making the will was suppressed; under such circumstances the will should be declared invalid.

In all cases of this kind the validity of the will depends more upon the abuse of a controlling influence than upon the fact of its existence, more upon the fact that the testator was not fairly dealt with, and not left free to pursue his own natural and healthful instincts and reasonable duties, than that the legatee benefited by the will had the power to control such will.

It need not be proved that there was an actual exercise of influence at the point of time the will was executed. Influence at any time, the effect of which was to produce the will without the fair concurrence of the mind of the testator, is sufficient to void the will.

Undue influence can rarely be proved by direct and positive testimony. It may be inferred from the nature of the transaction, from the true state of the testator's affections, from groundless suspicions against members of his family, if any such have been proved; and from all of the surrounding circumstances.

The question before the jury in this case is, whether the will in controversy here was the free act of Charles L. Low deceased or was the result of undue influence exercised by his wife Susan M. Low.

Undue influence, must be an influence, which overcomes the will or controls the judgment of the testator.

The influence which vitiates a will, must amount to force and coercion destroying free agency; it must not be the influence of gratitude, affection or esteem; it must not be the mere desire of gratifying the wishes of another—it must be the ascendency of another will over that of the testator.

The exercise of undue influence must be upon the very act of making the will, and must be proved and cannot be inferred from opportunity and interest.

A man has a right to make whatever disposition of his property he chooses, however absurd or unjust; if he has the capacity and free volition, his will must stand.

It is not sufficient to set aside a will, that the testator has made an unequal disposition of his property by reason of a partiality resulting from the kind and devoted attention of those to whom he bequeaths it.

A wife cannot be denied the place accorded to her in her husband's will, because it was due to the influence which she acquired over him by her good qualities and kind attentions in his lifetime, if she has not unduly exercised it.

A will can not be set aside because it is the result of an undue fondness for some member of the testator's family or of a causeless dislike to another.

It is not the province of the Court or jury to determine which of a man's relations or kindred is best entitled to his regard or should be preferred in his will. Within that circle the law does not measure the strength of the affections nor determine how much may be justly accorded to their demands.

No influence can be considered an undue influence which does not overpower the inclinations and judgment of the testator, and induce a disposition of his property contrary to his own wishes and desires.

Undue influence cannot be presumed, and the burden of proving it lies on the party alleging it.

Upon the evidence introduced in this case, Mrs. Susan M. Low was the wife of Charles L. Low at the time of his decease.

As such wife she was by law entitled to one-half of all the property acquired by him after their marriage, and the said Charles L. Low only had power to will one-half of the property.

The jury cannot take notice of any evidence offered and ruled out by the Court—their verdict must be based upon the evidence admitted by the Court.

The jury cannot draw any inferences from the rejection of evidence, nor can it be conjectured by the jury what the evidence would have been had it been introduced.

Now, gentlemen, you will apply these principles to the testimony in this case.

Before this will can be set aside, you must believe and find, that at the time of the execution of the will, the mind of C. L. Low was so under the control and influence of his wife, Mrs. Low, or of some other person, that he could not, if he had wished, have made a will different from this; you must believe that he had not sufficient strength of mind to resist such influence.

You may put to yourself such questions as these: Could Mr. Low at the time he made this will fairly and rationally consider those bound to him by ties of blood and of affinity; his son, his daughter-in-law, his grandchildren, and his other relations? Could he fairly and rationally consider and determine, for himself, the persons to whom he wished his estate to go? Could he fairly and rationally estimate the claims of his son and his grandchildren to an inheritance?

If Mr. Low had wished to make other or further provision for his son or grandchildren, had he sufficient control of his own mind and judgment, when the instructions for preparing this will were given, to have given instructions for such other or further provision? At the time that the will was executed, had he the judgment to say for himself how he wished to dispose of his property? When Messrs. Wilson and Wilson were with C. L. Low, on the evening of May 8th, 1877, and the reading and consideration of the will and its provisions were being had, did he give direction as to a change then to be made; and had he then sufficient control of himself to determine whether he wished that his son C. A. Low should have any of his property other than that referred to in his will? If he had wished his son to have more, could he then have given direction to have further provision inserted in the will? If he had wished to make provision for his grandchildren, could he have done so? Again, a few minutes later, when the witnesses were there, and signing and witnessing of the will were proceeding, and he was asked if that was his will, had he sufficient strength of mind, free from control, to declare whether or not that was his will? You are instructed, gentlemen, that what we call the

formal execution of the will, viz: signing, declaring and witnessing, is full and complete; and you have but to pass upon the free exercise of the judgments, opinions and wishes of the testator.

If you believe that Mr. Low gave the instructions to his attorney for the preparation of the will, that it was prepared according to those instructions, that he directed the additions to be made, that when he read it and heard it he understood its provisions, and that its provisions were according to his wishes, that at these times and when the will was executed, he had sufficient strength of mind and control of his own faculties to determine for himself that this will disposes of his property as he wished, and that he could, if he had wished, make any other disposition, you need not go any further in your investigations, but may at once return your verdict; for, if that be your belief, it does not concern you whether or no C. A. Low has a proper share of the estate, whether or no his father had made advances to him, whether or no he was amply provided for, whether or no C. L. Low loved the grandchildren, whether he married Mrs. Low early or late, whether he had affection for her or no, whether she was faithful to him or no; because, all these matters were for him to determine, and his judgment is binding upon us.

But, if you have doubts upon this subject, then you will consider the relation of the parties, and the testimony relating to them, to see whether he was so under the influence and control of any other person that he could not make a will according to his own wishes.

Was there a reason in the mind of C. L. Low, sufficient in his judgment for him to give to his son no more of the property than is provided for in this will?

You will observe that about the year 1871 there was a difference of opinion between the father and son as to a partnership and as to transactions thereof. They made a settlement; and whether there was a partnership and what were its transactions does not concern you; the parties settled those matters themselves. Subsequently, the title to the Niantic property being in C. A. Low, the father owing

him $50,000 arising out of the Kearny street property, a deed of the Niantic property from the son to the father was deposited in escrow with the First National Gold Bank and Trust Company, to be delivered by the Trust Company to C. L. Low upon his paying $50,000. An escrow may be defined to be a deposit of something by one person in the hands of another, to be delivered to a third upon the performance by that third person of some act. Therefore, the legal effect of the deposit by C. A. Low of this deed in escrow, to be delivered to C. L. Low upon the payment of $50,000, was to place the deed beyond the control of C. A. Low, with no right on his part to retake it without the consent of his father except on legal proceedings to terminate the escrow. It is in evidence that C. A. Low did retake the deed without notice to or the consent of his father, and place it in the Bank of California as security for his own debt of $6,000. C. L. Low was not informed of this transaction until about the time when he was preparing to execute his will. You are instructed that the degree of criticism which was to be made and the importance of that act to their relations as father and son, were for the father to determine for himself, so far as his conduct was to be governed by it.

Again, as to the amount of advances. The question is not, whether the son thought those advances sufficient, or whether you think them sufficient; but, rather, what did C. L. Low think of it? Did *he* deem them sufficient? Were they as much as he wished to make?

You are not here to determine whether you would have made a will such as this is, but you are to determine by the effect of your verdict whether this will expresses the wishes of Mr. C. L. Low, or whether he was a pliant instrument in the hands of some other person, so that he did not and could not express his own wishes.